COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


CHI ENERGY, INC. AND CHI
OPERATING, INC., 

                            Appellants,

v.

GABRIELA REYES URIAS,
INDIVIDUALLY AND AS NEXT
FRIEND OF NATALIE ANN URIAS,
A MINOR, GILBERT U. URIAS, SR.,
MARIA URIAS, LUCY PALLANES,
AND ISABEL PALLANES, JESUSITA
MARTINEZ PALLANES,
INDIVIDUALLY AND AS A
REPRESENTATIVE OF THE ESTATE
OF NORMAN PALLANES,
DECEASED, ALSO AS NEXT
FRIEND OF ZACARIAH ADAM
PALLANES, JEREMIAH MATTHEW
PALLANES, JONATHAN ELIJAH
PALLANES, JOHN MICHAEL
PALLANES, HANNA ANGELITA
PALLANES, MINOR CHILDREN OF
DECEDENT,

                            Appellees.

§

§

§

§

§

§



No. 08-02-00475-CV

Appeal from the

143rd District Court

of Reeves County, Texas

(TC# 01-04-17038-CVR)



O P I N I O N

           This is an appeal from a jury verdict in a premises liability case that resulted in the
deaths of Norman Pallanes and Gilbert Urias during the construction of improvements to an
oil well site. Appellant Chi Energy, Inc. was the owner of the leasehold interest in the oil
well involved in this incident. Chi Energy, Inc, operating through its subsidiary, Chi
Operating, Inc., undertook the drilling of an oil well that became known as the UL 18-19 No.
1. Chi Operating, Inc. served as the operating company responsible for the handling of the
day-to-day operations at this and other well sites. Other defendants that were included in the
original lawsuit either settled or were nonsuited prior to trial. The case went before a jury
against Appellants and one other defendant, Garland Pumping & Roustabout Services, Inc.,
who ultimately settled after trial. The jury awarded $7,880,272.97, in actual damages against
all the defendants. The judge entered a judgment in that amount, apportioning the claim in
conformance with the jury’s findings of proportionate recovery on the part of each plaintiff
with the addition of pre- and post-judgment interest.
           The Chi defendants appealed in separate briefs raising different points of error. Chi
Operating asserted five points of error and Chi Energy asserted seven points of error. Chi
Energy’s Issue Nos. One through Four challenge the legal and factual sufficiency of the
evidence of the jury’s findings that Chi Operating and Petroplex


, retained or exercised some
control over the manner of the performance of the work at the site to result in liability of Chi
Energy for the incident in question. We read these issues together as a challenge to the legal
and factual sufficiency of the evidence to support the jury’s findings that Chi Energy is liable
for the acts of the independent contractors West Texas Roustabout (WTR) or West Texas
Tank (WTT) under Chapter 95 of the Texas Civil Practice and Remedies Code.
           Similarly, Chi Operating has appealed asserting five issues. We read Chi Operating’s
Issue Nos. One through Three as a challenge to the legal and factual sufficiency of the
evidence to support the jury’s findings of liability of Chi Operating for the actions of the
independent contractors, West Texas Roustabout or West Texas Tank under Chapter 95 of
the Texas Civil Practice and Remedies Code. Because these issues are dispositive of this
appeal, we do not reach the Appellants’ remaining issues and, for the reasons stated herein,
we reverse the judgment of the trial court and render judgment in favor of Appellants.
I. ISSUES SUBMITTED ON APPEAL
           Appellants collectively have submitted twelve issues on appeal. A review of the
briefs establishes that the substantive complaint on appeal is that the trial court erred in
rendering judgment against Appellants based upon the lack of legally and factually sufficient
evidence to support a finding of liability under Chapter 95 of the Texas Civil Practice and
Remedies Code. Because the statement of an issue or point will be treated as covering every
subsidiary question that is fairly included, we consider the dispositive issues together. Tex.
R. App. P. 38.1(e).
II. SUMMARY OF THE EVIDENCE
           On April 6, 2001, an explosion occurred at an oil well site located in Ward County,
Texas just northwest of Pyote, Texas resulting in the deaths of Norman Pallanes and Gilbert
Urias. Appellant Chi Energy, Inc. is a company in the business of speculation and
development of oil and gas properties throughout Texas and New Mexico. Appellant Chi
Operating, Inc. is a corporation in the business of operation and production of oil wells. Chi
Operating was responsible for the day-to-day operations which included beginning
production on a well, maintaining production, and oversight of the daily management
functions to keep a well operating. Chi Operating also was responsible for retaining various
independent contractors to perform the necessary tasks related to the routine operation of an
oil well. The well where the accident occurred was a new well in the process of being put
into production. The explosion that resulted in the deaths of the decedents occurred during
the construction of the infrastructure and improvements to the well site that was necessary
for the production of petroleum products from this well.
           Chi Operating contracted with several entities to bring the well to operation, 
including Petroplex Equipment, Inc., a closely held corporation owned by Oren Albright. 
Petroplex was retained by Chi Operating to function as the well site consultant responsible
for completing and putting the UL 18-19 No. 1 well into production. Chi Operating also
entered into an oral agreement with WTT or WTR for the purchase of used equipment. The
agreement contemplated a “turnkey” purchase which required WTT to deliver and install
reconditioned tank-battery vessels


 to the well site.
           Norman Pallanes was the owner of West Texas Roustabout and Gilbert Urias was an
employee of WTR. WTR was a roustabout company that provided roustabout services for
oilfield clients. WTR had agreed to provide refurbished tank-battery vessels in ready
condition to the site of the oil well involved in the incident in question.
           The record contains a detailed account of the activities related to the work performed
by various independent contractors on the job during the course of several days in early April
of 2001. Once the well was completed, several other improvements had to be constructed
or installed to allow the well to produce. Critical to the production oil from this well was the
installation of the tank system purchased from WTR. WTR delivered the used tanks to the
site before removing all the extraneous fittings that remained from a previous installation;
the tanks were not ready for use in production. The deliveries took place over a three-day
period. WTR finally completed delivery of the partially reconditioned tanks on Wednesday
April 4, 2001. Employees of WTR began working on the completion of the installation of
the tanks on Thursday and Friday, April 5, and 6, 2001. WTR employees installed stairs and
catwalks on the tanks. The other independent contractors continued to complete their tasks
which ultimately required the necessity of connecting to the WTR tanks. Garland Pumping
and Roustabout Services, Inc. continued to plumb various items of equipment on the
location. At one point, an employee of Garland, Randy Hernandez and Albright discussed
that the tanks were not ready to be connected to the other equipment already in place and
needed additional work. Specifically several extraneous fittings needed to be removed from
the tanks. Norman Pallanes was informed of the problems with the tanks and was aware that
the fittings needed to be removed.
           The record is replete with details about the steps followed by Albright and other
contractors during the construction and testing activities that took place over the time period
of April 5-6, 2001. The weather conditions on April 6 were particularly bad and ultimately
resulted in Albright’s closing of the site. Albright informed Pallanes that he was shutting
down the site. Nevertheless, Pallanes contacted his brother, Roman Pallanes


, and requested
that a welder be sent to the site. Roman Pallanes dispatched a welder, employed by the
companies to work on the fittings.
           When the welder arrived at the site, he found only Garland’s crew still working. After
talking with Randy Hernandez, he telephoned Norman Pallanes for assistance because the
job was bigger than he could handle by himself. Pallanes and Urias were working at a
different well site but came over to the UL 18-19 No. 1 within a short period of time. 
Hernandez told Pallanes that Albright had shut down the site due to the inclement weather
but Pallanes was determined to work on removing the extraneous fittings.
           Employees of Garland were the last employees at the site on Friday afternoon April
6, 2001. Oren Albright had left earlier to return to his Midland office. Albright testified that
at the time he left, there was no equipment at the site capable of placing heat on the tank that
eventually exploded.
           Pallanes and his crew remained at the site alone and began work on removal of the
extraneous fittings from the tanks. Initially, Pallanes, Gilbert Urias, and his welder used
wrenches and cheaters in their attempts to remove the fittings. When that was unsuccessful,
he instructed his welder to begin placing heat on the fitting by using a cutting torch owned
by West Texas Roustabout. The welder applied heat for approximately 8 to 10 minutes but
when the operation was not successful, Norman Pallanes sent the welder back to the truck
to retrieve some additional tools. While the welder was at the truck, the water tank exploded
killing Norman Pallanes and Gilbert Urias.
           One group of survivors sued for damages on April 18, 2001 and the remaining
survivors filed a Plea in Intervention joining the suit on May 29, 2001. After a trial to a jury,
the trial court entered judgment on the findings in the amount of $7,880,272.97 plus pre- and
post-judgment interest. Chi Energy, Chi Operating, and Garland Pumping appealed. After
Garland reached a settlement with the plaintiffs below, Chi Energy and Chi Operating remain
as the only appellants and they appeal from the trial court’s judgment below.
                                                        III. DISCUSSION
           As stated previously, while reviewing Appellants’ issues, we read Chi Energy’s Issue
Nos. One through Four and Chi Operating’s Issue Nos. One through Three, as an attack on
the legal and factual sufficiency of the evidence supporting the jury’s finding of liability
under Chapter 95 of the Texas Civil Practice and Remedies Code.
 

A. Legal and Factual Sufficiency Standard of Review
           A “no evidence” or legal insufficiency point is a question of law which challenges the
legal sufficiency of the evidence to support a particular fact finding. There are basically two
separate “no evidence” claims. When the party having the burden of proof suffers an
unfavorable finding, the point of error challenging the legal sufficiency of the evidence
should be that the fact or issue was established “as a matter of law.” When the party without
the burden of proof suffers an unfavorable finding, the challenge on appeal is one of “no
evidence to support the finding.” See Creative Manufacturing, Inc. v. Unik, 726 S.W.2d 207,
210 (Tex. App.--Fort Worth 1987, writ ref’d n.r.e.). The standard of review requires a
determination by the appellate court as to whether, considering only the evidence and
inferences that support a factual finding in favor of the party having the burden of proof, in
a light most favorable to such findings, and disregarding all evidence and inferences to the
contrary, there is any probative evidence which supports the finding. Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965); see Terminix Intern., Inc. v. Lucci, 670 S.W.2d 657, 662 (Tex.
App.--San Antonio 1984, writ ref’d n.r.e.); see also Dayton Hudson Corp. v. Altus, 715
S.W.2d 670, 672 (Tex. App.--Houston [1st Dist.] 1986, writ ref’d n.r.e.). If more than a
scintilla of evidence supports the finding, the “no evidence” point fails. Tseo v. Midland Am.
Bank, 893 S.W.2d 23, 25 (Tex. App.--El Paso 1994, writ denied); Hallmark v. Hand, 885
S.W.2d 471, 474 (Tex. App.--El Paso 1994, writ denied).
           “Insufficient evidence” or factual insufficiency involves a finding that is so against
the great weight and preponderance of the evidence as to be manifestly wrong. When the
party having the burden of proof complains of an unfavorable finding, the point of error
should allege that the findings “are against the great weight and preponderance of the
evidence.” The “insufficient evidence” point of error is appropriate only when the party
without the burden of proof on an issue complains of the court’s findings. See Neily v.
Arron, 724 S.W.2d 908, 912 (Tex. App.--Fort Worth 1987, no writ).
           The test for factual insufficiency points is set forth in In re King’s Estate, 150 Tex.
662, 244 S.W.2d 660 (1951). In reviewing a point of error asserting that a finding is against
the great weight and preponderance of the evidence, we must consider all of the evidence,
both the evidence which tends to prove the existence of a vital fact, as well as evidence
which tends to disprove its existence. It is for the jury to determine the weight to be given
to the testimony and to resolve any conflicts in the evidence. Carrasco v. Goatcher, 623
S.W.2d 769, 772 (Tex. App.--El Paso 1981, no writ). The jury’s finding should be sustained
if there is some probative evidence to support it and provided it is not against the great
weight and preponderance of the evidence. Id. The parlance used by the courts of appeals
is that such a finding “shocks the conscience” or that it is “manifestly unjust,” limited by
such phrases as “the jury’s determination is usually regarded as conclusive when the evidence
is conflicting,” “we cannot substitute our conclusions for those of the jury,” and “it is the
province of the jury to pass on the weight or credibility of a witness’s testimony.” Kimsey
v. Kimsey, 965 S.W.2d 690, 700 (Tex. App.--El Paso 1998, pet. denied); Beall v. Ditmore,
867 S.W.2d 791, 795 (Tex. App.--El Paso 1993, writ denied). Thus, we cannot substitute our
judgment for that of the fact finder even if we find a fact contrary to that found by the jury,
provided the jury finding is supported by probative evidence and is not against the great
weight and preponderance of the evidence. If, however, the verdict is so contrary to the great
weight and preponderance of the evidence as to be manifestly unjust, the point should be
sustained.
B. Civil Practice and Remedies Code Chapter 95
           Chapter 95 of the Civil Practices and Remedies Code was enacted in 1996 as part of
a sweeping tort-reform package. Tex. Civ. Prac. & Rem. Code Ann. §§ 95.001-.004
(Vernon 1997); see Fisher v. Lee & Chang P'ship, 16 S.W.3d 198, 201 (Tex. App.--Houston
[1st Dist.] 2000, pet. denied). Chapter 95 governs “Property Owner’s Liability for Acts of
Independent Contractors and Amount of Recovery” and pertains to claims “for damages
caused by negligence” against a “property owner.” Tex. Civ. Prac. & Rem. Code Ann. §
95.001(1)-(3) (Vernon 1997). Section 95.001(3) defines “property owner” as “a person or
entity that owns real property primarily used for commercial or business purposes.” Tex.
Civ. Prac. & Rem. Code Ann. § 95.001(3). Chapter 95 specifies that it “applies only to a
claim” described as follows: (1) against a property owner, contractor, or subcontractor for
personal injury, death, or property damage to an owner, a contractor, or a subcontractor or
an employee of a contractor or subcontractor; and (2) that arises from the condition or use
of an improvement to real property where the contractor or subcontractor constructs, repairs,
renovates, or modifies the improvement. Tex. Civ. Prac. & Rem. Code Ann. §
95.002(1)-(2) (Vernon 1997).
           When Chapter 95 applies, a property owner will not be liable for negligence claims
arising from the failure to provide a safe workplace unless: (1) the property owner exercises
or retains some control over the manner in which the work is performed, other than the right
to order the work to start or stop or to inspect progress and receive reports; and (2) the
property owner had actual knowledge of the danger or condition resulting in the personal
injury, death or property damage and failed to adequately warn. Tex. Civ. Prac. & Rem.
Code Ann. § 95.003(1)-(2) (Vernon 1997). Both conditions of section 95.003 must be met
before liability will be imposed upon the property owner. Id.; see Kelly v. LIN Television,
27 S.W.3d 564, 567 (Tex. App.--Eastland 2000, pet. denied). The “failure to provide a safe
workplace” means that the injuries must relate to work being done by the injured party, but
the injury-producing defect need not be the object of the injured party’s work. See Fisher,
16 S.W.3d at 202 (construing legislative history and holding that injury resulting from
defective ladder contractor used to access air-conditioning unit contractor was hired to repair
was injury within scope of section 95.002(2)).
C. Applicability of Chapter 95
           We conclude that Chapter 95 governs all of Appellees’ negligence claims against
Appellants. It is clear that the legislature, following years of Texas jurisprudence, intended
to limit the liability of an owner and operator for injuries arising out of an independent
contractor’s actions through the enactment of Chapter 95 of the Texas Civil Practice and
Remedies Code. Ashabranner v. Hydrochem Industrial Services, Inc., No. 14-03-00762-CV, 
 2004 WL 613026, at *2 (Tex. App.--Houston [14th Dist.] March 30, 2004, no pet.); see also
Redinger v. Living, 689 S.W.2d 415, 418 (Tex. 1985). Both requirements under section
95.003 of the Civil Practice and Remedies Code must be met before a landowner can be held
liable for injuries sustained by an independent contractor’s employee. First, the landowner
must have more than a general right to order workers to stop or start, a right to inspect, or
right to receive reports. Tex. Civ. Prac. & Rem. Code Ann. § 95.003(1) (Vernon 1997);
Ashabranner, 2004 WL 613026, at *2; see also Koch Refining Co. v. Chapa, 11 S.W.3d 153,
155 (Tex. 1999) (per curiam) (citing Restatement (Second) of Torts § 414 (1965)). Second,
the land owner must have “‘actual knowledge of the danger or condition resulting in the
personal injury . . . and failed to adequately warn.’” Tex. Civ. Prac. & Rem. Code Ann. §
95.003 (Vernon 1997); Ashabranner, 2004 WL 613026, at *2; see also Fisher, 16 S.W.3d
at 202. After reviewing the entire appellant record, we agree there is no evidence to show
control or actual knowledge as required by section 95.003.
           We address the issue of control first. Control may be proven in two ways: (1) a
contractual right of control or (2) an exercise of actual control. Ashabranner, 2004 WL
613026, at *2; Dow Chem. Co. v. Bright, 89 S.W.3d 602, 606 (Tex. 2002). A right of
control is contingent upon the ability to control the means, methods, or details of WTT’s and
WTR’s work. Ashabranner, 2004 WL 613026, at *2. The question as to whether or not
there is a contractual right of control is generally a question of law for the court. Id.
           We agree with Appellants that the question of the right to control the work of WTR
and WTT is dispositive of the case before us. To impose liability on the Chi defendants,
Appellees must prove that the degree of control must be more than “the right to order the
work to start or stop or to inspect progress or receive reports . . . .” Tex. Civ. Prac. & Rem.
Code Ann. § 95.003(1). The record is completely devoid of any evidence to suggest that
either of the Appellants imposed any right to control the work at the site in question and
certainly none over the specifics of the work performed by the employees of WTR or WTT. 
The detailed testimony of the various subcontractors that performed a variety of tasks at the
scene support the Appellants’ position that they had no right to control the daily tasks of any
of the independent contractors and particularly the work of WTT or WTR.
           The undisputed evidence establishes the contrary fact as a matter of law. Norman
Pallanes directed that his employee Gilbert Urias and his welder return to the site after
everyone else had left and perform specific tasks solely under his direction and control, using
his equipment to perform tasks that he was obligated to perform under his agreement as an
independent contractor responsible for providing turnkey ready tanks. No one, not even 
Petroplex’s Oren Albright, retained any control over Norman Pallanes’s decision to apply
heat to the tank that eventually exploded. We recognize that the tank itself was not an
inherently dangerous item. See, e.g., Delgado v. Houghston, No. 08-99-00044-CV, 2000 WL
678774, at *4 (Tex. App.--El Paso May 25, 2000, no pet.) (not designated for publication). 
The circumstances that resulted in the explosion was the application of heat to the tank by
Norman Pallanes. Though tragic, the decision regarding how to handle the extraneous fitting
problem was solely the decision of Norman Pallanes.
           We agree with Appellants that the right to control the work must extend to the
“operative detail” of the contractor’s work. The right to control may be proved “‘by evidence
that the premises owner actually exercised control over the manner in which the independent
contractor’s work was performed.’” Conoco, Inc. v. Brown, No. 04-02-00336-CV, 2003 WL
22295302, at *1 (Tex. App.--San Antonio October 8, 2003, pet. denied); Dow Chem. Co.,
89 S.W.3d at 606. The degree of control retained must be more than a mere “‘general right
to order the work stopped or resumed, to inspect its progress or to receive reports, to make
suggestions or recommendations which need not necessarily be followed, or to prescribe
alterations and deviations.’” Conoco, Inc., 2003 WL 22295302, at *1; Koch Ref. Co., 11
S.W.3d at 155 (quoting Restatement (Second) of Torts § 414 cmt. c (1965). In other words,
the right to control must extend to the “operative detail” of the contractor’s work. Conoco,
Inc., 2003 WL 22295302, at *1; Koch Ref. Co., 11 S.W.3d at 155-56; Victoria Elec. Co-op.,
Inc. v. Williams, 100 S.W.3d 323, 326 (Tex. App.--San Antonio 2002, pet. denied). 
Moreover, there must be a nexus between the control actually exercised and the resulting
injury. Conoco, Inc., 2003 WL 22295302, at *1; Dow Chem., 89 S.W.3d at 606.
           Here, we see no evidence to support a finding that the Appellants retained any control
over the “operative details” of the work. Similarly, we find no evidence to support the
finding that Appellants had actual knowledge of a danger or condition such that they incurred
a duty to warn Pallanes of the existence of a hazard at the site. Recognizing that they had no
control over the site and virtually no contact with the independent contractors directly, we
hold Appellants had no actual knowledge of any allegedly dangerous condition at that site. 
Chapter 95 of the Texas Civil Practice and Remedies Code only imposes a duty to warn of
a known danger or condition. Tex. Civ. Prac. & Rem. Code Ann. § 95.003(2); see also
Ashabranner, 2004 WL 613026, at *2. The record does not contain even a scintilla of
evidence to support such a finding.
             Because there is no evidence that Appellants exercised any control over WTR or
WTT employees or that Appellants had actual knowledge of any dangerous condition at the
site, we sustain, Appellants’ Issue Nos. One through Three and Issue Nos. One through Four,
as described above, and reverse the judgment of the trial court. Because these issues are
dispositive of this appeal, we need not reach the remaining issues.
           We, therefore, having sustained Appellants’ Issue Nos. One through Three and Issue
Nos. One through Four on the basis of legal insufficiency of the evidence, we reverse the
judgment of the trial court and render judgment in favor of Appellants.

                                                                  RICHARD BARAJAS, Chief Justice
January 27, 2005

Before Panel No. 4
Barajas, C.J., Larsen, and McClure, JJ.
Larsen, J., not participating